IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re | )    **Chapter 7** |
| | )    **Case No. 20-30602** |
| **HIGH MESA, INC.,** *et al.,* | )    **(Jointly Administered)** |
| | ) |
| Debtors. | ) |
| | ) |
| --------------------------------------------------------------- | ) |
| | ) |
| **CHRISTOPHER R. MURRAY, as Chapter 7 Trustee** | ) |
| **for the Estates of Debtors High Mesa Inc., et al.** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    **Adv. Proc. No. _____** |
| | ) |
| **MICHAEL ELLIS; HARLAN CHAPPELLE;** | ) |
| **CHAPPY ENERGY, LLC; BCE-MESA HOLDINGS,** | ) |
| **LLC; BCE-AMH HOLDINGS, LLC; MARK** | ) |
| **STONER; WILLIAM MCMULLEN; ANDREW** | ) |
| **KOEHLER; and JEFFREY HOSTETTLER,** | ) |
| | ) |
| Defendants. | ) |
| | ) |
| --------------------------------------------------------------- | ) |

## COMPLAINT

Christopher R. Murray, solely in his capacity as the Chapter 7 Trustee (the "**Trustee**" or "**Plaintiff**") of the above-captioned debtors (the "**Debtors**"), by and through his undersigned counsel, files this complaint (the "**Complaint**") against Michael Ellis; Harlan Chappelle; Chappy Energy, LLC; BCE-MESA Holdings, LLC; BCE-AMH Holdings, LLC;

---

[1] The Debtors are the following entities: High Mesa, Inc., High Mesa Holdings, L.P., Alta Mesa Acquisition Sub, LLC, Alta Mesa Drilling, LLC, Alta Mesa Energy, LLC, Alta Mesa GP, LLC, AM Idaho, LLC, AM Michigan, LLC, AMH Energy New Mexico, LLC, Aransas Resources, LP, ARI Development, LLC, Brayton Management GP II, LLC, Brayton Resources II, LP, Brayton Resources, LP, Buckeye Production Company, LP, Cairn Energy USA, LLC, FBB Anadarko, LLC, Galveston Bay Resources, LP, High Mesa Holdings GP, LLC, LEADS Resources, LLC, Louisiana Exploration & Acquisition LP, Louisiana Onshore Properties, LLC, Navasota Resources Ltd. LLP f/k/a Hilltop Acquisition, LLC, Nueces Resources, LP, Petro Acquisitions, LP, Petro Operating Company, LP, Sundance Acquisition, LLC, TEA Energy Services, LLC, Texas Energy Acquisitions, LP, The Meridian Production, LLC, The Meridian Resource and Exploration, LLC, The Meridian Resource, LLC, Virginia Oil and Gas, LLC, High Mesa Services, LLC and HMS Kingfisher Holdco, LLC.

Mark Stoner; William McMullen; Andrew Koehler; and Jeffrey Hostettler (collectively, the "**Defendants**") to avoid and recover fraudulent transfers, and to disallow any claims held by Defendants. In support of this Complaint, Plaintiff hereby alleges as follows:

## I.  NATURE OF THE CASE

1.     This lawsuit arose because Defendants – insiders and control persons of Debtors – made self-serving loans to insolvent Debtors, repayment of which was funded by stripping the Debtors of valuable assets for less than reasonably equivalent value. Defendants caused the Debtors to enter these insider loans while Debtors teetered on the verge of bankruptcy. Not only were insider Defendants enriched by preferential repayment of their self-serving loans, but third parties received assets of the debtors at "fire sale" prices without giving the Debtors reasonably equivalent value. Defendants' fiduciary duty breaches left these debtors – already insolvent and unable to pay their debts as they became due – on the brink of bankruptcy, which Debtors filed exactly one month following repayment of the loans. Plaintiff, the Trustee of the Debtors' bankruptcy estates, seeks to hold Defendants accountable for their actions and to repair the damage that Defendants inflicted upon the Debtors.

2.     Three distinct groups owned and controlled the High Mesa Debtor entities: (1) "**Management**," including Michael Ellis ("**Ellis**"), Harlan Chappelle ("**Chappelle**"), and Chappy Energy, LLC ("**Chappy Energy**"), which was owned by Harlan Chappelle; (2) "**BCE**" – BCE-MESA Holdings, LLC ("**BCE-MESA**") and BCE-AMH Holdings, LLC ("**BCE-AMH**") (affiliates of the private equity group Bayou City Energy, LLC) and its principals Mark Stoner ("**Stoner**"), William McMullen ("**McMullen**"), and Andrew Koehler ("**Koehler**"); and (3) "**HPS**" – the private equity group HPS Investment Partners, LLC and it principal Jeff Hostettler ("**Hostettler**"). Collectively, HPS and BCE are referred to as "**Private Equity**" herein.

3.      Debtor High Mesa, Inc. ("**HMI**") is the parent company in the High Mesa corporate structure. High Mesa Holdings GP, LLC ("**HMH GP**") is a wholly owned subsidiary of HMI. HMH GP is the general partner of Debtor High Mesa Holdings, LP ("**HMH**"), the holding company which held equity interests in nearly all of the other Debtors, including AM Idaho, LLC ("**AM Idaho**"). Management and Private Equity owned approximately 100% of HMI. Additionally, HMI owned approximately 91% of the limited partnership interests in HMH. Entities owned and/or controlled by Defendants Ellis and Chappelle owned the remaining interests in HMH.

4.      Another wholly owned subsidiary of HMI is High Mesa Services, LLC ("**HMS**"). Prior to closing of the transactions that are the subject of this Complaint, HMS owned 70% of the membership interests in Northwest Gas Processing, LLC ("**NWGP**"). Entities associated with entities invested in or represented by Weiser-Brown Oil Co. ("**WB**") owned the remaining 30% of the membership interests in NWGP. The following chart demonstrates the complex ownership structure of the Debtors:



5.      Due to their ownership interest in HMI, Management and Private Equity each appointed directors to the board of directors of HMI. From February 2019 through the date Debtors filed bankruptcy, the HMI board consisted of the following Defendant directors (the "**Directors**"):

| Defendant Group | HMI Directors | From As Early As | Through End Date |
|---|---|---|---|
| Management | Chappelle | August 13, 2015 | January 24, 2020 |
| Management | Ellis | August 13, 2015 | January 24, 2020 |
| HPS | Hostettler | January 28, 2019 | January 24, 2020 |
| BCE | Stoner | September 30, 2016 | January 24, 2020 |
| BCE | Koehler | January 28, 2019 | January 28, 2019 |

Of these five Directors, three represented the interests of Private Equity: Hostettler represented HPS, and Stoner and Koehler represented BCE. Additionally, Defendant McMullen – a former director of HMI – represented the interests of BCE. The Directors also served on the board of managers of HMH GP and HMS. Additionally, Chappelle served as the sole manager of AM Idaho.

6.      At all times that Management and Private Equity led the charge to plunder the Debtors' assets, the five Directors (appointed by Management and Private Equity) owed fiduciary duties of care and loyalty to those Debtors. Specifically, the Directors owed fiduciary duties to HMI, HMH GP, HMH, HMS, and/or AM Idaho, because of their roles as directors or managers of these Debtors and because of their exercise of control over the assets of HMH, HMS, and AM Idaho. The Directors breached their fiduciary duties owed to Debtors by making self-serving loans to the Debtors and then stripping the Debtors of valuable assets for less than reasonably equivalent value to repay those loans.

7.      Ultimately, the Directors caused the Debtors to sell assets at what Chappelle admitted were "fire sale price[s]": Debtors sold assets worth over $16 million for only $7.4 million – less than half their value – so that the loans Management and Private Equity provided to the Debtors could be repaid, while the Debtors' balances with their remaining creditors

continued to grow. Of the combined $7.4 million purchase price for the Debtors' assets, the Directors caused the Debtors to use:

    a. $2.5 million to repay insider loans, with interest, to Defendants Chappy Energy, BCE-Mesa, BCE-AMH, and Ellis (the "**Insider Lenders**");

    b. $3.3 million to make various payments that did not benefit Debtors, but benefitted the WB Entities (who purchased the assets of HMS and AM Idaho at deeply discounted prices);

    c. $50,000 to a newly appointed "independent director" of HMI; and

    d. $850,000 for work performed by various law firms – some of whom performed work, not for the Debtors, but for other parties to the transactions.

8.    The Insider Lenders and McMullen aided and abetted the Directors' breach of their fiduciary duties for the benefit of Management and Private Equity by making the insider loans to the Debtors and causing the proceeds of the Debtors' asset sales to be used to repay these insider loans ahead of all other creditors, despite the Debtors' precarious financial situation. Defendants' actions resulted in damages suffered by the Debtors, who declared bankruptcy soon after Defendant's looting and pillaging.

9.    The Trustee seeks to recover for the damages, actual and consequential, the Defendants caused by breaching – or aiding and abetting others in breaching – their fiduciary duties. The Trustee also seeks to avoid and recover as a fraudulent transfers the Debtors' transfer of nearly $2.4 million in payments to the Insider Lenders, pursuant to the Bankruptcy Code and Texas Uniform Fraudulent Transfer Act. Additionally, the Trustee seeks to recover pre- and post-judgment interest, costs, and reasonable and necessary attorney's fees provided for under the law. Finally, the Trustee seeks to disallow any and all claims of the Defendants against the Debtors pursuant to section 502 of the Bankruptcy Code.

## I.     JURISDICTION AND VENUE

10.     The United States Bankruptcy Court for the Southern District of Texas, Houston Division (the "**Court**") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334(b).

11.     This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b)(2) and this Court may enter a final order consistent with Article III of the United States Constitution.

12.     Venue of this adversary proceeding is proper in this district pursuant to 28 U.S.C. § 1409(a). This adversary proceeding is related to the jointly administered Chapter 7 bankruptcy cases that are pending in this district and jointly administered under the caption *In re High Mesa, Inc., et al.*, Case No. 20-20306 (the "**Bankruptcy Cases**").

13.     The statutory predicates for the relief sought herein are sections 502, 544, 547, 548 and 550 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

14.     Pursuant to Federal Rule of Bankruptcy Procedure 7008, the Trustee states that he hereby consents to the Bankruptcy Court's entry of final orders and judgment in this adversary proceeding.

## II.     PROCEDURAL BACKGROUND

15.     On January 24, 2020 (the "**Petition Date**"), each of the Debtors filed a voluntary petition under Chapter 7 of the Bankruptcy Code in the United States Bankruptcy Case for the Southern District of Texas, Houston Division. [Dkt. No. 1].

16.     On January 27, 2020, the Court appointed Christopher R. Murray as the Chapter 7 Trustee of the bankruptcy estates of the Debtors pursuant to section 701(a) of the Bankruptcy Code.

17.     On January 30, 2020, the Court entered an order approving joint administration of the Bankruptcy Cases. [Dkt. No. 10].

18.     The section 341 meeting of the creditors was held and concluded on March 3, 2020.

### III.    THE PARTIES

#### A.    The Plaintiff

19.     Plaintiff Christopher R. Murray is the duly appointed Trustee for the Debtors' bankruptcy estates. Plaintiff maintains an office at Jones Murray & Beatty LLP, 602 Sawyer Street, Suite 400, Houston, Texas 77007.

#### B.    The Relevant Debtors

20.     HMI is a Delaware corporation founded in 2006. It was formerly known as Alta Mesa Investment Holdings, Inc., a Delaware corporation founded by Defendant Michael Ellis. Alta Mesa Investment Holdings was renamed HMI in 2014.

21.     HMH GP is a Delaware limited liability company founded on June 27, 2017. HMH GP is wholly owned by HMI.

22.     HMH is a Delaware limited partnership founded on June 27, 2017. Its sole general partner is HMH GP. Additionally, at all relevant times, HMI owned approximately 91% of the equity interests in HMH.

23.     HMS is a Delaware limited liability company founded on October 31, 2014 and is a wholly owned subsidiary of HMI. Until December 24, 2019, HMS owned a 70% membership interest in Northwest Gas Processing, LLC.

24.     AM Idaho is a Texas limited liability company founded on January 31, 2012. HMH became the sole member of AM Idaho effective February 8, 2018.

#### C.    The Defendants

##### i.   *Management Defendants*

25.     Defendant Michael Ellis is an individual and resident of the State of Texas. Ellis may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. At all relevant times, Ellis served as a director or manager of the following Debtors: (1) HMI, (2) HMH GP, and (3)

HMS. At all relevant times, Ellis also held an ownership interest of approximately 19.675% in the Debtors through a web of various entities. In his capacity as manager of HMH GP, Ellis was a control person of HMH. Additionally, in his capacity as a control person of HMH, Ellis was a control person of AM Idaho.

26.     Defendant Harlan Chappelle is an individual and resident of the State of Texas. Chappelle may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. At all relevant times, Chappelle served as a director or manager of the following Debtors: (1) HMI, (2) HMH GP, and (3) HMS. At all relevant times, Chappelle also held an ownership interest of approximately 6.15% in the Debtors. In his capacity as manager of HMH GP, Ellis was a control person of HMH. Additionally, in his capacity as a control person of HMH, Chappelle was a control person of AM Idaho.

27.     Defendant Chappy Energy, LLC is a Texas limited liability company with its principal place of business at 31 Hammock Dunes Place, Spring, TX 77389 206 E. 9th Street, Suite 1300, Austin, TX 78701-4411. Chappy Energy may be served through its registered agent, Capitol Corporate Services, Inc. at 209 E. 9th Street, Suite 1300, Austin, TX 78701. Chappy Energy is owned and controlled by Harlan Chappelle.

### ii.  BCE Defendants

28.     Defendant BCE-MESA Holdings, LLC is a Delaware limited liability company with its principal place of business at 1201 Louisiana Street, Suite 3308, Houston, TX 77002. BCE-MESA may be served through its registered agent, William W. McMullen. Since as early as February 20, 2018, BCE-MESA has owned approximately 34.9 % of the common stock of HMI.

29.     Defendant BCE-AMH Holdings, LLC is a Delaware limited liability company with its principal place of business at 1201 Louisiana Street, Suite 3308, Houston, TX 77002.

BCE-AMH may be served through its registered agent, William W. McMullen. Since as early as February 20, 2018, BCE-AMH has owned approximately 7% of the common stock in HMI.

30.     Together, BCE-MESA and BCE-AMH are affiliates of Bayou City Energy, LLC and are referred to herein as the "**BCE Affiliates**." At all relevant times, the BCE Affiliates appointed two members of HMI's board of directors.

31.     Defendant Mark Stoner is an individual and resident of the State of Texas. Stoner may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. From at least as early as March 9, 2018, to the Petition Date, Stoner served on the board of directors and managers of the following Debtors as a designee of the BCE Affiliates: (1) HMI, (2) HMH GP, and (3) HMS. In his capacity as manager of HMH GP, Stoner was a control person of HMH. Additionally, in his capacity as a control person of HMH, Stoner was a control person of AM Idaho.

32.     Defendant William McMullen is an individual and resident of the State of Texas. McMullen may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. From at least as early as March 9, 2018, to January 28, 2019, McMullen served on the board of directors and managers of the following Debtors as a designee of the BCE Affiliates: (1) HMI, (2) HMH GP, and (3) HMS. McMullen actively participated in the discussions about HMI rescue financing.

33.     Defendant Andrew Koehler is an individual and resident of the State of Texas. Koehler may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. From January 28, 2019, to the Petition Date, Koehler served on the board of directors and managers of the following Debtors as a designee of the BCE Affiliates: (1) HMI, (2) HMH GP, and (3) HMS. In his capacity as manager of HMH GP, Koehler was a control person of HMH. Additionally, in his capacity as a control person of HMH, Koehler was a control person of AM Idaho.

### iii.  HPS Defendant

34.     Defendant Jeffrey Hostettler is an individual and resident of the State of New York. Hosteller may be served pursuant to Federal Rule of Bankruptcy Procedure 7004. He is a managing director at HPS. From January 28, 2019, to the Petition Date, Hostettler served on the board of directors and managers of the following Debtors as a designee of HPS: (1) HMI, (2) HMH GP, and (3) HMS. In his capacity as manager of HMH GP, Hostettler was a control person of HMH. Additionally, in his capacity as a control person of HMH, Hostettler was a control person of AM Idaho.

## IV.     FACTUAL BACKGROUND

### A.     The Defendants' Ownership and Control of the Debtors

#### i.   The Management Defendants' Ownership and Control of the Debtors

35.     At all relevant times, Ellis held an indirect interest in the Debtors through his ownership and/or control of the following: (1) AM MME Holdings, LP; (2) Galveston Bay Resources, LP; (3) Petro Acquisitions Holdings, LP; (4) Petro Operating Company Holdings, Inc.; (collectively, the "**Ellis Entities**") and (5) AM Equity Holdings, LP ("**AM Equity**"). Together with AM Equity, the Ellis Entities collectively owned approximately 14.595% of HMI's common stock.

36.     Additionally, Ellis also held direct and indirect interests in HMH. Ellis directly owned 0.0713% of HMH's Class A, B, C, and D interests, while the Ellis Entities and AM Equity together owned 6.4106% of HMH's Class A, B, and C interests and 1.1725% of HMH's Class D interests.

37.     At all relevant times, Chappelle owned approximately 4.799% of HMI's common stock. Chappelle also owned 24.9825% of AM Equity, which in turn owned 5.4097% of HMH's Class A, B, and C interests and 0.0478% of HMH's Class D interests.

38.     Through their ownership interest in HMI, Ellis and Chappelle were able to appoint members of HMI's board of directors. During the period from at least as early as December 30, 2016, to the Petition Date, Ellis and Chappelle served on HMI's board.

### ii.   The BCE Defendants' Ownership and Control of the Debtors

39.     BCE held its ownership interest in the Debtors through two holding companies, the BCE Affiliates: (a) BCE-MESA and (b) BCE-AMH. At all relevant times, the BCE Affiliates owned the following percentage of HMI's common stock:

| Entity | Ownership % |
|---|---|
| BCE-MESA | 34.936% |
| BCE-AMH | 7.090% |
| **BCE Affiliates' Total Ownership of HMI** | **42.026%** |

40.     Through this ownership, the BCE Affiliates were able to appoint two members of HMI's board of directors. At all relevant times, Mark Stoner served on HMI's board of directors as the BCE Affiliates' designee. During the period from at least as early as December 30, 2016, through January 28, 2019, William McMullen also served on HMI's board of directors as a designee of the BCE Affiliates. On January 28, 2019, Andrew Koehler replaced McMullen as the BCE Affiliates' designee and served on HMI's board of directors until the Petition Date.

### iii.   The HPS Defendants' Ownership and Control of the Debtors

41.     HPS held an ownership interest in the Debtors through four holding companies, (collectively, the "**HPS Affiliates**"): (a) Mezzanine II Partners Delaware Subsidiary, LLC ("**Mezzanine II**"), (b) Offshore Mezzanine Partners Master Fund II, L.P. ("**Offshore**"), (c) Institutional Mezzanine Partners II Subsidiary, L.P. ("**Institutional**"), and (d) AP Mezzanine Partners II, L.P. ("**AP Mezz**"). At all relevant times, the HPS Affiliates owned the following percentage of HMI's common stock:

| Entity | Ownership % |
|---|---|
| Mezzanine II | 10.176% |
| Offshore | 17.454% |

| Institutional | 1.842% |
|---|---|
| AP Mezz | 2.132% |
| **HPS Affiliates' Total Ownership of HMI** | **31.604%** |

42.     Through this ownership, the HPS Affiliates appointed one member of HMI's board of directors. From January 28, 2019, to the Petition Date Hostettler served on HMI's board of directors as the HPS designee.

**B.     The Failed Interstate Transaction**

43.     As early as December 2018, HMH had begun to negotiate with Interstate Explorations, LLC ("**Interstate**") for a potential sale of twenty-five percent (25%) interest in certain oil and gas properties owned by AM Idaho (upstream) and NWGP (midstream) to an Interstate affiliate, Fenter Energy, LLC ("**Fenter**") (the "**Interstate Transaction**"). Interstate offered to purchase twenty-five (25%) interest for $15 million, based on the valuation of $60 million for 8/8th of all Idaho assets.

44.     After months of negotiations, Interstate communicated a desire to acquire a twenty-five percent (25%) of HMS's membership interest in NWGP, rather than a twenty-five percent (25%) interest in NWGP's assets, in addition to the twenty-five percent (25%) interest in AM Idaho's assets.[2] The revised terms of the Interstate Transaction were to be memorialized through the execution of a Purchase and Sale Agreement between AM Idaho and Fenter (the "**Fenter PSA**") and a Membership Interest Purchase Agreement between HMS and another Interstate affiliate, Southern Transfer Partners, LLC ("**Southern Transfer**") (the "**Southern Transfer MIPA**").

45.     The Fenter PSA and the Southern Transfer MIPA were revised to reflect the new total purchase price of $10 million[3] for twenty-five percent (25%) of AM Idaho's assets

---

[2] Due to this change, two separate agreements were drafted, MIPA and PSA, instead of a single PSA for assets of two separate entities.
[3] The aggregate purchase price was allocated as follows: $4,272,342.00 for the NWGP membership interests and $5,727,658.00 for the AM Idaho assets.

and a twenty-five percent (25%) interest in the membership interests of NWGP. The relevant revised terms were as follows:

    a.   Pursuant to the terms of the draft Fenter PSA, Fenter planned to acquire a twenty-five percent (25%) interest in certain oil and gas properties owned by AM Idaho for a total purchase price of $5,727,658. The purchase price was to be paid in two installments: the first installment was payable on the closing date, and the second installment was to be paid within one business day after Fenter's receipt of the Harmon Pipeline Certification Notice.

    b.   Pursuant to the terms of the draft Southern Transfer MIPA, Southern Transfer planned to acquire a twenty-five percent (25%) ownership interest in NWGP from HMS. As consideration for the sale of its ownership interest, HMS was to receive $4,272,342 from Southern Transfer. The total purchase price was to be paid in two installments: the first installment payable on the Closing date and the second installment was payable within one business day after the earlier of (a) Southern Transfer's failure to timely contest the Harmon Pipeline Certification Notice, (b) Southern Transfer's acceptance of the Harmon Pipeline Certification Notice, or (c) the date on which any dispute between HMS and Southern Transfer concerning the Harmon Pipeline Certification Notice is resolved.

46.    The terms of both the Fenter PSA and the Southern Transfer MIPA referred to the Harmon Pipeline – a 9.5-mile, 8-inch transportation pipeline from the Harmon field to the Little Willow Facility (an upstream gathering facility) in Idaho. The pipeline was to be constructed and installed to deliver hydrocarbons from the wells to the processing plant at the Little Willow Facility. The costs for the initial construction and installation of the pipeline, estimated to be approximately $6 million, were to be borne by all owners of the NWGP in

proportion to their ownership in the company. However, under the terms of the Southern Transfer MIPA, HMS would be obligated to fund the buyer's 25% share of the construction costs.

47.     Pursuant to the terms of the Interstate Transaction, proceeds from the sale of the NWGP membership interests were to be used to fund the Harmon Pipeline construction costs. Under the Southern Transfer MIPA, HMS was obligated to use commercially reasonable efforts to complete the construction, installation, and testing of the Harmon Pipeline System on or before December 31, 2019.

48.     In August 2019, after months of negotiations, execution versions of these agreements were circulated among the transaction parties. Although these agreements were anticipated to be executed on August 22, 2019, the buyers never executed the agreements, the Interstate Transaction was never consummated, and AM Idaho and HMS did not receive the millions of dollars of proceeds they would have otherwise received from Fenter and Southern Transport.

### C.     Insiders Provide "Rescue Financing" at the Debtors' Expense

49.     On August 26, 2019, five days after Interstate was provided with execution copies of the Fenter PSA and Southern Transfer MIPA, certain of the Directors began to express their concerns regarding the dire financial condition of the Debtors' business. That same day, the Debtors received notice from two key vendors threatening to withdraw services unless the Debtors made payments on their outstanding invoices.

50.     First, at around 9:30 am on August 26, 2019, Danos, LLC ("**Danos**"), the operator and monitor of Debtor well sites across the country, sent HMI an email threatening to "withdraw [its] staff from the facilities" two days later if it did not receive a minimum payment of $200,000 from the Debtors by noon that same day. Scott Ricks, then serving as HMI's Chief Executive Officer and HMH GP's President, shared this email with the Directors.

51.     Second, at around 10:30 a.m. on August 26, 2019, Adams & Reese, the law firm defending certain Debtors in important litigation entitled *Biloxi Marsh Lands Corporation v. Alta Mesa Biloxi Marsh* (the "**Biloxi Marsh Litigation**"), sent several Directors an email requesting a payment of $250,000 to continue as counsel for those Debtors.

52.     Given the Debtors' inadequate capitalization and lack of liquidity to pay creditors, by mid-day on August 26, 2019, the Directors began to express serious concern about the viability and continuation of the Debtors' business – as illustrated by communications from Mark Stoner to the other Directors at around 12:30 pm on August 26, 2019:

> Guys – given the threatening events of the past few hours, BCE immediately requests engagement on rescue financing. We do not have the luxury of time any longer. Consistent with our message when we (sic) our request for engagement on a contingency plan was ignored over a week ago, attached is a letter requesting action. Kirkland [& Ellis (counsel for BCE)] will send across documents later.

53.     The letter attached to Stoner's email, addressed to director Jeff Hostettler, illustrated the Debtors' dire financial condition and insolvency:

> Jeff:
>
> As you know, High Mesa, Inc. ("HMI") has insufficient liquidity to prudently operate and maximize the value of its various assets for the benefit of shareholders. Indeed, in recent weeks, the Company's cash position has deteriorated significantly and stood at $124,457 as of August 26, 2019. BCE believes that it is imperative that the Company urgently secure additional liquidity.
>
> The window for action necessary to preserve and maximize shareholder value is quickly closing. Over the last two weeks, the Company's management has repeatedly advised its Board of Directors, including the BCE and HPS Board representatives, that HMI can no longer fund its operations in the ordinary course (including statutory wage and tax obligations that may impose personal liability on HMI's directors and controlling shareholders), which will lead to a bankruptcy filing. Additionally, the company recently received the below notices from a couple of its critical service vendors:

Stoner's letter went on to describe the threats by Danos and Adams & Reese to withdraw their services unless the Debtors made payments on their outstanding invoices.

### D.    The Insider Loans

54.    By August 27, 2019, BCE's attorneys at Kirkland & Ellis had circulated a draft promissory note to the Directors outlining the terms for certain equity owners or their affiliates to provide "rescue financing" to HMI. However, Hostettler, one of the HPS-appointed directors, expressed serious concern to the Directors and McMullen regarding the financing proposed by the BCE directors:

> . . . I do not believe that the BCE financing, as currently proposed, is in the best interests of HMI and its creditors.

Despite recognizing that the proposed BCE financing was not in the Debtors' or their creditors' best interest, the financing was unanimously approved by the Directors, including Hostettler.

55.    On September 12, 2019, HMI executed a $2,244,100 promissory note (the "**Insider Note**") in favor of BCE-MESA, BCE-AMH, Michael Ellis and Chappy Energy (the "**Insider Lenders**"). McMullen executed the Insider Note as the manager of the BCE Affiliates. The Insider Note called for two advances: (1) $1,122,050 to be advanced to HMI by the Insider Lenders on or before September 13, 2019 (the "**First Insider Loan**"), and (2) $1,122,050 to be advanced to HMI by the Insider Lenders – if on October 10, 2019, HMI made a written request for the second (the "**Second Insider Loan**," and collectively with the First Insider Loan, the "**Insider Loans**").

56.    The Insider Note provided that the outstanding principal amount under the Insider Loans would bear interest at a rate of 12% in addition to automatically accruing "PIK Interest." The Insider Loans had a maturity date of the earlier of (i) March 12, 2020, or (ii) the date all amounts were declared or became automatically due and payable.

57.    Under the Insider Note,[4] – which was prepared by the BCE Affiliates' attorneys – HMI was required to pay to the Insider Lenders, among other costs, the following "Financing Expenses":

---

[4] The funding under the Insider Note was conditioned upon the contemporaneous amendment of HMI's

full amount of all payments, advances, charges, costs, and expenses, including reasonable attorney's fees expended or incurred by [the Insider Lenders] in connection with . . . the preparation and negotiation of the Loan Documents . . . [up to $50,000.]

58.     Additionally, nearly all of HMI's subsidiaries, including HMH, AM Idaho, and HMS, unconditionally guaranteed the timely payment and performance of HMI's obligations under the Insider Note (the "**Subsidiary Guarantors**"). Accordingly, the Subsidiary Guarantors guaranteed HMI's obligation to repay the Insider Loans and any "Financing Expenses" incurred by the Insider Lenders.

59.     As security for the payment and performance in full of these obligations under the Insider Note, each "Loan Party," including HMI and each of the Subsidiary Guarantors, granted the Insider Lenders a security interest in all of the assets owned by such Loan Party.

60.     Given the Debtors' precarious financial condition and extreme undercapitalization at the time of the Insider Loans, the Insider Lenders sought to ensure their loans would be repaid before any other creditors. In furtherance of this self-interested objective, the Insider Note required HMI to cause each Subsidiary Guarantor to

> [a]pply the Net Cash Proceeds from any completed sale by any Loan Party of assets . . . in a single transaction or series of related transactions with a fair market value in excess of $100,000 to the extent the aggregate amount of such Net Cash Proceeds exceeds $1,122,500 . . . first to the payment of any outstanding Financing Expenses . . . and thereafter to the prepayment of the outstanding Principal Amount[.]

Under these terms, if AM Idaho or HMS ultimately consummated the sale of their assets, the proceeds were required to be used to first pay off the "Financing Expenses" incurred by the Insider Lenders, and then to pay any outstanding amounts owed by HMI on the Insider Loans. Thus, the Insider Lenders were strongly motivated to consummate a sale of the Debtors' assets, at whatever price necessary, to ensure their loans would be repaid ahead of any other creditors.

---

Stockholders Agreement. Amendment No. 2 to the Fifth Amended and Restated Stockholders Agreement of HMI, dated September 12, 2019, required unanimous consent for a second loan under the Insider Note and required HPS nominees to the HMI board of directors to obtain prior written consent of the BCE nominees to the HMI board of directors if HPS wanted to purchase HMI assets or incur or secure additional debt to satisfy the debt owed under the Note.

### E.   Funding of the First Insider Loan

61.    In September 2019, the funding of the First Insider Loan occurred in the following amounts:

| Insider Lender | Date | Amount |
|---|---|---|
| BCE-MESA | 9/13/2019 | $836,171.00 |
| BCE-AMH | 9/12/2019 | $163,829.00 |
| Michael Ellis | 9/12/2019 | $62,500.00 |
| Chappy Energy | 9/12/2019 | $59,550.00 |
| **Total** | | **$1,122,050.00** |

The loan proceeds were used to make payments to certain vendors, for mandatory state tax payments and to fund payroll.

### F.   Repayment of a Portion of the First Insider Loan Using Proceeds from the Sale of HMH's Equity Interests in ARM Energy Management, LLC

62.    Meanwhile, the Directors had been contemplating selling HMH's 10% equity interest in ARM Energy Management, LLC ("**AEM**"). On or about June 20, 2019, Stoner spoke with the Chief Investment Officer and Chief Financial Officer of ARM Energy Holdings, LLC ("**AEH**"), regarding AEH purchasing HMH's 10% equity interest in AEM. AEH indirectly owned 80% of AEM's equity interests through its wholly owned subsidiary ARM Energy Services, LLC ("**AES**"). Chappelle's son served as the Vice President of Trading at AEH. While the Directors discussed searching for a third-party purchaser to ensure a fair price, one was never located.

63.    On July 26, 2019, Stoner received an initial valuation of AEM along with supporting financial documents from AEH. During the following two weeks, AEH and the Directors negotiated the purchase price for the transaction. On September 25, 2019, AEH's wholly owned subsidiary, AES, offered to purchase HMH's 10% equity stake in AEM for $2.1 million. That same day, Chappelle emailed his son, Bryan Chappelle, (Vice President of Trading at AEH), that the offer was a "fire sale price."

64.     Nevertheless, the sale eventually closed on or about October 14, 2019, when AES purchased HMH's 10% equity stake in AEM, together with HMH's 10 common shares of ARM Canada, ULC, for a total purchase price of $2.15 million. From these gross proceeds, HMH received some $1.9 million (after netting out legal fees sent directly to Willkie Farr), which it then used to: (1) pay $50,000 in "Financing Expenses" to Kirkland & Ellis pursuant to the Insider Note, (2) repay $749,969 in principal and pay $12,375 in accrued interest on the First Insider Loan to the Insider Lenders, and (c) fund various operating expenses for certain the Debtors.

65.     Thus, on October 15, 2019, HMH made the following transfers to the Insider Lenders to repay a portion of the First Insider Loans:

| Insider Lender | Date | Amount |
|---|---|---|
| BCE-MESA | 10/15/2019 | $568,112.63 |
| BCE-AMH | 10/15/2019 | $111,308.78 |
| Michael Ellis | 10/15/2019 | $42,463.94 |
| Chappy Energy | 10/15/2019 | $40,459.55 |
| **Total** | | **$762,344.90** |

After HMH's repayment of these amounts, there was approximately $384,456 outstanding on the First Insider Loan.

### G.     Funding of the Second Insider Loan

66.     In October 2019, funding of the Second Insider Loan occurred in the following amounts:

| Insider Lender | Date | Amount |
|---|---|---|
| BCE-MESA | 10/15/2019 | $836,171.00 |
| BCE-AMH | 10/16/2019 | $163,829.00 |
| Michael Ellis | 10/16/2019 | $62,500.00 |
| Chappy Energy | 10/16/2019 | $59,550.00 |
| **Total** | | **$1,122,050.00** |

Following the funding of the Second Insider Loan, approximately $1,506,506.63 was outstanding on the Insider Loans, before accrual of any interest.

**H.    Defendants Caused AM Idaho and HMS to be Stripped of Valuable Assets for Less Than Reasonably Equivalent Value**

67.    On October 18, 2019, Weiser-Brown Oil Company ("**WB**") and its investors, which then owned 30% of the membership interests in NWGP, sent HMS a letter of intent containing terms of WB's proposal to acquire the following valuable assets of AM Idaho and HMS:

> (a) 35% of the issued and outstanding limited liability company interests, options, warrants and other equity interests or securities convertible into equity interests of High Mesa Services, LLC . . . in Northwest Gas Processing, LLC . . . and (b) a 35% of 8/8ths interest in certain upstream oil, gas and mineral properties and the related assets of AM Idaho, LLC[.]

WB proposed a total purchase price of $5,250,000 for these assets (the "**WB Transaction**"). Accordingly, WB, an insider whose investors already owned 30% of NWGP, proposed to acquire a larger percentage of many of the same assets that were part of the failed Interstate Transaction – for nearly half of the price.

68.    On December 24, 2019, after approximately two months of negotiations, the relevant contracts were signed, and the WB Transaction closed.

69.    On December 24, 2019, AM Idaho, as seller, and WB and certain of its investors[5] (collectively, the "**Asset Buyers**"), as buyers, entered into a Purchase and Sale Agreement (the "**WB PSA**") for the purchase of an undivided thirty-five percent of eight-eighths (35% of 8/8th) right, title and interest in certain assets of AM Idaho.

70.    In exchange for the 35% of 8/8th interest in AM Idaho's assets, the Asset Buyers were to pay AM Idaho a purchase price totaling $1.05 million. Of this price, $20,000 of the proceeds were to be deposited by the Asset Buyers into a new bank account opened by WB to fund NWGP's installation and construction of the Harmon Pipeline (the "**WB Harmon**

---

[5] These investors included CTM 2005, Ltd.; Shore Energy, L.P.; Orlofsky Mineral Holdings, LLC; SEJ LLC; Justiss Oil Company, Inc.; W.B. McCartney Oil Company, Inc.; Ruston-Idaho, LLC; and Atlanta Guardian Company, LLC.

**Account**"). The remaining $1,030,000 was payable to AM Idaho by the Asset Buyers at closing.

71.     On December 24, 2019, HMS, as seller, and certain investors of WB as buyers (collectively, the "**Equity Buyers**," and collectively with the Asset Buyers, the "**WB Buyers**"), and WB, as buyer representative, entered into a Membership Interest Purchase Agreement (the "**WB MIPA**") for the purchase of thirty-five percent (35%) of NWGP's outstanding membership interest from HMS.

72.     The Equity Buyers paid an aggregate purchase price for the membership interests in NWGP of $4.2 million. However, only $2.02 million of these proceeds was slated to go to HMS. The remaining $2.18 million was to be deposited by the Equity Buyers into the WB Harmon Account to pay costs associated with NWGP's installation and construction of the Harmon Pipeline.

73.     The Debtors also incurred additional costs in connection with WB Transaction. Pursuant to the WB MIPA, "[e]ach Party acknowledge[d] and agree[d] that an affiliate of [HMS] owe[d] [NWGP] $511,592.20 for past due processing fees (the "**Fees**") as of immediately prior to the Closing." The WB MIPA required HMS to pay these fees to NWGP concurrently with closing. However, HMS received no consideration for this payment.

74.     In connection with the WB MIPA, HMS was also required to "reclassify" a loan to NWGP in the amount of $509,404 as an equity contribution. On information and belief, HMS was essentially required to write-off this loan and treat it as if it was an equity investment. HMS received no consideration for writing off this loan.

75.     The WB Transaction closed on December 24, 2019, exactly one month before the Debtors' bankruptcy filings. Gordon Arata, a law firm used by certain Debtors and WB, agreed to act as the escrow agent for the WB Transaction. As part of the WB Transaction, the

WB Buyers transferred $100,000 directly to the WB Harmon Account—$20,000 as called for under the WB PSA, and $80,000 as called for under the WB MIPA.

76.     The WB Buyers deposited the remaining $5.15 million of the purchase price into the Gordon Arata trust account on December 24, 2019. Of this amount, the Directors allowed the application of some $2.66 million as follows:

      i.     $42,000 was transferred to WB. This amount represents a 70% share of the $60,000 in marketing costs WB purportedly incurred on behalf of AM Idaho and NWGP in connection with the WB Transaction;

      ii.    $10,474.75 was transferred to WB principal Richard Brown, purportedly for consulting fees;

      iii.   $2.1 million was transferred to the WB Harmon Account under the WB MIPA; and

      iv.   $511,592.20 was transferred to NWGP to pay for the past due processing fees allegedly owed by AM Idaho to NWGP, as required under the WB MIPA.

77.     Neither AM Idaho nor HMS received any benefit from the Harmon Pipeline, as the construction of the Harmon Pipeline was in the initial phases at the time of the transaction. Rather, the Directors who caused these Debtors to undertake these transactions, knew that these entities would be filing bankruptcy in the near term. Indeed, AM Idaho and HMS filed voluntary petitions for relief under Chapter 7 of the Bankruptcy Code, along with all of the other Debtors, exactly one month from the close of the WB Transaction.

78.     Of the remaining proceeds from the WB Transaction, the Directors caused $1,030,000 to be transferred to HMH from Gordon Arata's trust account on December 24, 2019, and $1,455,933.05 to be transferred to HMS from Gordon Arata's trust account. Nothing was transferred to AM Idaho.

79.     The Directors caused HMS immediately to transfer the $1,455,933.05 it received from Gordon Arata's trust account to HMH. Altogether, HMH received a total of $2,485,933.05 from the proceeds generated by the sale of AM Idaho's and HMS's assets to the WB Buyers.

80.     At the time the Directors caused these transfers to occur, AM Idaho and HMS were insolvent or became insolvent as a result thereof. As of September 30, 2019, AM Idaho had a net working capital deficit of nearly $1 million and millions of dollars of contingent liabilities stemming from the Biloxi Marsh Litigation. At the time of the WB Transaction, HMS had debts of more than $12 million. However, the Directors caused HMS to sell half of its primary asset (its interest in NWGP) and stripped HMS of any benefits resulting from this sale. The sale thus left AM Idaho and HMS insolvent, with liabilities outweighing their assets.

**I.     Neither AM Idaho Nor HMS Received the Benefit of the Proceeds Generated by the Sale of Their Assets**

81.     Neither AM Idaho nor HMS received any benefits from the sale of their valuable assets. Instead, the Directors caused most of these proceeds to be used to repay the Insider Loans and the law firms that assisted with the WB Transaction, as illustrated in the following table:

| Insider Lender | Date | Amount |
|---|---|---|
| BCE-MESA | 12/24/2019 | $1,193,344.47 |
| BCE-AMH | 12/24/2019 | $233,808.78 |
| Michael Ellis | 12/24/2019 | $89,197.08 |
| Chappy Energy | 12/24/2019 | $84,986.98 |
| **Total** | | **$1,601,337.31** |

These payments were made according to the terms of the Insider Note, which required the proceeds of any sale to be applied to any outstanding amounts on the Insider Loans.

82.     Further, the Directors caused $554,055.35 of the sales proceeds to be transferred to the law firms that assisted with the WB Transaction for outstanding fees on various matters: Willkie Farr & Gallagher, LLP ($360,317.85), Kirkland & Ellis ($58,737.50) and Gordon

Arata ($135,000). The Directors caused another $50,000 to be transferred to a newly appointed "independent director," Andrew Kidd.

83.     At the time of these transactions, the Debtors were insolvent, unable to pay their debts as they matured and possessed unreasonably small capital. Prior to closing the sale of the WB Transaction, members of HMI's board of directors had even met with insolvency professionals to consider what relief may be available through a bankruptcy filing. One month after WB Transaction closed and the Insider Loans were paid off before any other creditors, the Debtors filed for bankruptcy.

## V.     CAUSES OF ACTION

### COUNT #1
### (Against Directors)

### BREACH OF FIDUCIARY DUTY

84.     The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

85.     Chappelle, Ellis, Stoner, Koehler, and Hostettler served as members of HMI's board of directors HMH GP's and HMS's board of managers. Chappelle served as AM Idaho's sole manager. As managers of HMH GP, the Directors also exercised complete control over HMH and its property. In these capacities, the Directors owed the fiduciary duties of care and loyalty to Debtors HMI, HMH GP, HMH, HMS, and AM Idaho.

86.     These fiduciary duties obligated the Directors to act in the best interests of these Debtors and not themselves.

87.     The Directors breached their fiduciary duties by (a) causing the Debtors to enter into the Fraudulent Transfers described below[6] and (b) permitting the transfer of assets

---

[6] *See* Count #3.

pursuant to the WB Transaction for less than reasonably equivalent value, in order to ensure that the Debtors repaid their obligations under the Insider Note.

88.     At the time the Directors negotiated the WB Transaction, they knew that the Debtors were either insolvent or on the verge on insolvency. Yet the Directors caused the sale of some of the Debtors' assets for less than they knew the assets were worth.

89.     As a result of the Directors' breach of fiduciary duties of care and loyalty – by causing the Debtors to consummate a sale for less than reasonably equivalent value – the Debtors were left with insufficient liquidity to continue operations, after the repayment of the Insider Note and the payment to law firms who assisted in the preparation of the loan documents and the asset sale documents.

90.     As a direct and proximate result of the Directors' breach of fiduciary duty, the Debtors suffered damages.

### COUNT #2
### (Against all Defendants)

### AIDING AND ABETTING BREACHES OF FIDUCIARY DUTY

91.     The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

92.     In the alternative, to the extent that that any of the Directors might not have had a fiduciary duty to the Debtors at the time of the transaction complained of here, each such Defendant is nevertheless liable for having aided and abetted the breach of fiduciary duties by one or more of the other Defendants possessing such duties at the relevant times.

93.     Additionally, the non-Director Defendants are liable for having aided and abetted the breach of fiduciary duties by one or more of the other Defendants possessing such duties at the relevant times.

94.     As described in the paragraphs above, each non-fiduciary Defendant substantially assisted, knowingly participated in, benefited from and aided and abetted the breaches of fiduciary duties engaged in by the other Defendants.

95.     As a result of this improper conduct, the Debtors have suffered damages in an amount to be determined at trial.

### COUNT #3
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

### AVOIDANCE AND RECOVERY OF PREPETITION TRANSFERS
### PURSUANT TO 11 U.S.C. §§ 548(a)(1)(A) AND 550(a)

96.     The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

97.     The Trustee seeks to avoid the following fraudulent transfers and recover the value of each from any initial, immediate, and/or mediate transferees (collectively, the "**Fraudulent Transfers**")

     i.    $568,112.63 transferred to BCE-MESA on October 15, 2019, for the repayment of HMI's obligations under the Insider Note;

    ii.    $111,308.78 transferred to BCE-AMH on October 15, 2019, for the repayment of HMI's obligations under the Insider Note;

   iii.    $42,463.94 transferred to Ellis on October 15, 2019, for the repayment of HMI's obligations under the Insider Note;

    iv.    $40,459.55 transferred to Chappy Energy on October 15, 2019, for the repayment of HMI's obligations under the Insider Note;

    v.    $1,193,344.47 transferred to BCE-MESA on December 24, 2019, for the repayment of HMI's obligations under the Insider Note;

    vi.    $233,808.78 transferred to BCE-AMH on December 24, 2019, for the repayment of HMI's obligations under the Insider Note;

> vii.   $89,197.08 transferred to Ellis on December 24, 2019, for the repayment of HMI's obligations under the Insider Note; and
>
> viii.   $84,986.98 transferred to Chappy Energy on December 24, 2019, for the repayment of HMI's obligations under the Insider Note.

98.   Each Fraudulent Transfer was a "transfer" within the meaning of 11 U.S.C. § 101(54)(D)(i) or (ii).

99.   Each Fraudulent Transfer occurred within two (2) years of the Petition Date.

100.   Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

101.   The facts set forth herein demonstrate that Directors caused the Debtors to make the Fraudulent Transfers with the actual intent to hinder, delay, and/or defraud the Debtors' creditors.

102.   First, the Debtors' property was transferred to or for the benefit of insiders. All Directors owned, directly or indirectly, stock of the Debtors.

103.   Second, the Directors caused the Debtors to remove assets by transferring them to themselves through the Fraudulent Transfers.

104.   Third, the value of the consideration received by the Debtors in exchange for their assets was less than reasonably equivalent value of the assets transferred.

105.   Fourth, the Debtors were insolvent or became insolvent shortly after the Fraudulent Transfers were made.

106.   Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers ("**Avoidable Transfers**") pursuant to Section 548(a)(1)(A) of the Bankruptcy Code.

107.   As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or meditate transferee of such initial transferee.

108.     Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

**COUNT #4**
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

**AVOIDANCE AND RECOVERY OF PREPETITION TRANSFERS**
**PURSUANT TO 11 U.S.C. §§ 548(a)(1)(B) AND 550(a)**

109.     The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

110.     As set forth in detail above, the Debtors seek to avoid the Fraudulent Transfers and recover the value of each from any initial, immediate, and /or mediate transferees.

111.     Each Fraudulent Transfer was a "transfer" within the definition of 11 U.S.C. § 101(54)(D)(i) or (ii).

112.     Each Fraudulent Transfer occurred within two (2) years of the Petition Date.

113.     Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

114.      As more particularly set forth above, the Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

115.     As more particularly set forth above, the Fraudulent Transfers were made at a time when the Debtors were insolvent (or rendered insolvent as a result of the Fraudulent Transfers), had unreasonably small capital, and/or had incurred (or intended to incur) debts beyond their ability to pay as such debts matured.

116.      Accordingly, the Fraudulent Transfers constitute avoidable fraudulent transfers pursuant to Section 548(a)(1)(B) of the Bankruptcy Code.

117.     As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the entity for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or meditate transferee of such initial transferee.

118.    Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

**COUNT #5**
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

**AVOIDANCE AND RECOVERY OF PREPETITION TRANSFERS**
**PURSUANT TO TEX. BUS. & COM. CODE ANN. §§ 24.005(a)(1) AND**
**24.006(a) AND 11 U.S.C. §§ 544(a)(1)(b) AND 550(a)**

119.    The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

120.    At all times material hereto, the Debtors had at least one creditor prior to making each of the Fraudulent Transfers.

121.    The facts set forth herein demonstrate that Directors caused the Debtors to transfer property of the Debtors with the actual intent to hinder, delay, or defraud the Debtors' other creditors.

122.    First, the Debtors' property was transferred to or for the benefit of insiders. All Directors owned, directly or indirectly, stock of the Debtors.

123.    Second, the Directors caused the Debtors to remove assets by transferring them to themselves through the Fraudulent Transfers.

124.    Third, the value of the consideration received by the Debtors in exchange for their assets was less than reasonably equivalent to the value of the assets transferred.

125.    Fourth, the Debtors were insolvent or became insolvent shortly after the Fraudulent Transfers were made.

126.    Accordingly, these transfers were avoidable under Sections 24.005(a)(1) and 24.006(a) of the Texas Business and Commerce Code, and Section 544 of the Bankruptcy Code.

127.    As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the party for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

128.    Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

**COUNT #6**
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

**AVOIDANCE AND RECOVERY OF PREPETITION TRANSFERS**
**PURSUANT TO TEX. BUS. & COM. CODE ANN. §§ 24.005(a)(2) and**
**24.006(a) and 11 U.S.C. §§ 544(a)(1)(b) AND 550(a)**

129.    The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

130.    At all times material thereto, the Debtors had at least one creditor prior to making the above-described Fraudulent Transfers.

131.    Each of the Fraudulent Transfers was a transfer of property, or of an interest in property, of the Debtors to and/or for the benefit of the Defendants.

132.    As more particularly set forth above, the Debtors did not receive reasonably equivalent value in exchange for the Fraudulent Transfers.

133.    As more particularly set forth above, the Fraudulent Transfers were made at a time when the Debtors were insolvent (or were rendered insolvent as a result of the Fraudulent Transfers) and were generally not paying their debts as they came due as a result of liquidity problems and working capital deficits plaguing the Debtors.

134.    Accordingly, the Fraudulent Transfers are voidable under Sections 24.005(a)(2) and 24.006(a) of the Texas Business and Commerce Code, and Section 544 of the Bankruptcy Code.

135.    As more particularly set forth above, the Defendants were the initial transferees of the Fraudulent Transfers, or the party for whose benefit the Fraudulent Transfers were made, or, alternatively, the immediate or mediate transferee of such initial transferee.

136.    Accordingly, the Trustee is entitled to recover the Fraudulent Transfers or their value pursuant to Section 550 of the Bankruptcy Code.

**COUNT #7**
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

**UNJUST ENRICHMENT**

137.    The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

138.    Each of the Fraudulent Transfers described above conferred a benefit on the Defendant which received it, and the Defendants unjustly retained that benefit at the expense of the Debtors' estates.

**COUNT #8**
**(Against BCE-MESA, BCE-AMH, Ellis, and Chappy Energy)**

**DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(b) AND (j)**

139.    The Trustee repeats and re-alleges each and every allegation previously set forth in this Complaint as if fully set forth herein.

140.    Defendants are transferees of transfers avoidable under sections 547 and 548 of the Bankruptcy Code, which property is recoverable under Section 550 of the Bankruptcy Code.

141.    The Defendants have not paid the amount of the Transfers or turned over such property for which the Defendants are liable under section 550 of the Bankruptcy Code.

142.    Pursuant to section 502(d) of the Bankruptcy Code, any and all claims of the Defendants against the Debtors must be disallowed until such time as the Defendants pay the Trustee the aggregate amount of the Avoidable Transfers, plus interest thereon and costs.

143.    Pursuant to section 502(j) of the Bankruptcy Code, any and all Claims of Defendants, and/or their assignee, against the Debtors previously allowed by the Debtors or by the Trustee, must be reconsidered and disallowed until such time as Defendants pay to the Trustee an amount equal to the aggregate amount of the Avoidable Transfers.

### **PRAYER**

WHEREFORE, Plaintiff Christopher R. Murray, solely in his capacity as Chapter 7 Trustee of the jointly administered bankruptcy estates of the Debtors, demands judgment against the Defendant as follows:

A.    All damages, actual and consequential, sustained by the Debtors as a result of the conduct of the Directors described above;

B.    Avoiding the Fraudulent Transfers pursuant to 11 U.S.C. § 548(a);

C.    Avoiding the Fraudulent Transfers pursuant to Texas Business and Commerce Code §§ 24.005 and 24.006 and 11 U.S.C. § 544;

D.    Recovery of the monetary value of the Fraudulent Transfers, plus interest pursuant to 11 U.S.C. § 550(a);

E.    Disallowance of any of Defendant's claims pursuant to 11 U.S.C. § 502(d) and (j);

F.    Costs and reasonable attorneys' fees pursuant to Texas Business and Commerce Code § 24.013;

G.    Pre-judgment and post-judgment interest as allowed by law; and

H.    For such other and further relief as the Court deems just and proper.

Date: January 21, 2022

Respectfully submitted,

DANIELS & TREDENNICK, PLLC

By: */s/ Andrea L. Kim*

    Andrea L. Kim
    Texas State Bar No. 00798327
    andrea@dtlawyers.com
    Rebecca A. Muff
    Texas State Bar No. 24083533
    rebecca@dtlawyers.com
    Thomas Moss
    Texas State Bar No. 24090282
    thomas@dtlawyers.com
    6363 Woodway Dr., Suite 700
    Houston, Texas 77057
    (713) 917-0024 (Telephone)
    (713) 917-0026 (Facsimile)

**COUNSEL FOR CHAPTER 7 TRUSTEE
CHRISTOPHER R. MURRAY**